UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL ACTION NO. 04-10112-RGS



**UNITED STATES OF AMERICA**

**v.**

**ABLOLOM WOLDESLASSIE**



**MEMORANDUM AND ORDER ON GOVERNMENT'S
MOTION FOR DETENTION**


**JULY 28, 2004**


**BOWLER, Ch.U.S.M.J.**

On or about April 15, 2004, defendant Ablolom Woldeslassie
(the "defendant"), was arrested pursuant to an eight count
Indictment returned in this district on April 8, 2004.  The
Indictment charges the defendant and codefendants Justin Teal
(codefendant "Teal"), Karl Thompsom (codefendant "Thompson") and
Roland Worrell (codefendant "Worrell").  The defendant is named
in counts two, three, five, seven and eight of the Indictment
which charge him with distribution of cocaine base in violation
of Title 21, United States Code, Section 841(a)(1), distribution

within a playground zone in violation of Title 21, United States
Code, Section 860(a) and aiding and abetting in violation of
Title 18, United States Code, Section 2.  Additionally Count
Seven charges the defendant and codefendant Teal with use of a
juvenile in violation of Title 21, United States Code, Section
861(a).

The defendant had his initial appearance before this court
on April 15, 2004.  He was represented by court appointed
counsel.  The government moved to detain the defendant on the
grounds that there is no condition or combination of conditions
that will reasonably assure (1) the safety of any other person
and the community and (2) the appearance of the defendant.  18
U.S.C. §§ 3142 (d)(1)(A)(i), (f)(1)(C) and (f)(2)(A).  The
government moved for a three day continuance and a detention
hearing was scheduled before this court on April 23, 2004.

On that date the defendant entered into a period of
voluntary detention without prejudice.  At a status conference on
June 6, 2004, defense counsel moved to reopen the issue of
detention and requested a detention hearing on June 16, 2004.  On
that date defense counsel requested a continuance until June 21,
2004.

On that date this court conducted a hearing on the issue of
detention.  The defendant was represented by court appointed
counsel.  The government called one witness speaking to the issue

2

of detention.  At the conclusion of the first day of testimony
the hearing was continued until June 25, 2004, by agreement of
counsel.  On that date the defendant called three witnesses.  At
the conclusion of the testimony this court took the issue of
detention under advisement.[1]

## DISCUSSION

I.   A.  Under the provisions of 18 U.S.C. § 3142(c), "[t]he
judicial officer may not impose a financial condition that
results in the pretrial detention of the person."  Thus, a
defendant must be released under the provisions of 18 U.S.C. §
3142(b) or (c), or be detained pending trial under the provisions
of 18 U.S.C. § 3142(e) and after a hearing pursuant to 18 U.S.C.
§ 3142(f).  See 18 U.S.C. § 3142(a).

     Under 18 U.S.C. § 3142(e), a defendant may be ordered
detained pending trial if the judicial officer finds one of the
following three conditions to be true that: (1) by clear and
convincing evidence, after a detention hearing under the
provisions of § 3142(f), ". . . no condition or combination of
conditions (set forth under 18 U.S.C. § 3142(b) or (c)) will
reasonably assure the safety of any other person or the community

---

[1] Codefendant Worrell entered into a period of voluntary detention without prejudice on April 20, 2004 and codefendant Teal entered into a period of voluntary detention without prejudice on May 5, 2004.  Codefendant Thompson was detained pursuant to an ORDER of this court issued on May 14, 2004.

. . .;" (2) by <u>a preponderance of</u> the evidence, after a detention hearing under the provisions of 18 U.S.C. § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C. § 3142(b) or (c)) will reasonably assure the appearance of the person as required . . .;" or (3) there is a serious risk the defendant will flee.[2]   This determination is made by the court at the conclusion of a detention hearing.

B.   The government is entitled to move for detention in a case that:

(1)  involves a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4);[3]

---

[2]  The distinction between the former and the latter are made clear by the very language of 18 U.S.C. § 3142(f).  In the last paragraph of that section, Congress has stated there must be <u>clear and convincing</u> evidence to authorize pretrial detention when the question is whether any condition or combination of conditions "will reasonably assure the <u>safety of any other person and the community</u> . . .."  (Latter emphasis added.)  By not requiring that same standard <u>vis</u> <u>a</u> <u>vis</u> an assessment of risk of flight, it is clear that a lesser standard--i.e., preponderance of the evidence-- applied.  That is precisely the holding in the Second Circuit.  <u>See</u> <u>e.g.</u>, <u>United States v. Jackson</u>, 823 F.D 4, 5 (D.C.Cir. 1987); <u>United States v. Berrios-Berrios</u>, 791 F.2d 246, 250 (2d Cir. 1986), <u>cert</u>. <u>dismissed</u>, 107 S.Ct. 562 (1986); <u>see also</u> <u>United States v. Patriarca</u>, 948 F.2d 789, 792 (1st Cir. 1991).

[3]  Section 3156 of Title 18 of the United States Code defines a crime of violence as:

(A)  an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another, or

(B)  any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

4

(2)   involves an offense punishable by death or life imprisonment;

(3)   involves an offense prescribed by the Controlled Substances Act or the Controlled Substances Import and Export Act for which the maximum authorized punishment is imprisonment for ten years or more;[4] or

(4)   involves any felony alleged to have been committed after the defendant has been convicted of two or more crimes of violence, or of a crime, the punishment for which is death or life imprisonment, or a ten year [or more] offense under the Controlled Substances Act or the Controlled Substances Import and Export Act.

Additionally, the government or the court sua sponte may move for, or set, a detention hearing where there is a serious risk of flight, or a serious risk of obstruction of justice or threats to potential witnesses.  See 18 U.S.C. § 3142(f).


C.  In determining whether there are conditions of release which will reasonably assure the appearance of the person and the safety of any other person and the community, this court must

---

18 U.S.C. § 3156(a)(4).

[4] The maximum penalty is that provided by the statute defining and/or providing the punishment for the substantive offense--not the sentence, or even the maximum sentence, which might otherwise be imposed under the federal Sentencing Guidelines.  See United States v. Moss, 887 F.2d 333, 336-7 (1st Cir. 1989).

take into account:

> > (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> > (2) the weight of the evidence against the accused;
>
> > (3) the history and characteristics of the person, including--
>
> > > (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> > > (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and
>
> > (4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

D.  The burden of persuasion remains with the government to establish "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  The burden then rests on the defendant to come forward with evidence indicating that these general findings are not applicable to him for whatever reason advanced.  The government must satisfy its

position with respect to risk of flight by a preponderance of
evidence and with respect to dangerousness by clear and
convincing evidence.  See supra footnote 3.  This court must then
weigh all relevant factors [set forth under §3142(g)] and
determine whether "any condition or combination of conditions
will reasonably assure the appearance of the [defendant] as
required and the safety of any other person and the community."
The decision is an individualized one based on all relevant
factors.  United States v. Patriarca, 948 F.2d 789, 794 (
Cir. 1991); see United States v. Jessup, 757 F.2d 378, 387-88
(1st Cir. 1985).

    Moreover, one may be considered a danger to the community
even in the absence of a finding by clear and convincing evidence
that the accused will engage in physical violence.  Conversely,
as noted by the Committee on the Judiciary (Report of the
Committee on the Judiciary, United States Senate), on S. 215.
98th Congress, Report No. 98-147 (May 25, 1983):

> The concept of defendant's
> dangerousness is described throughout
> this chapter by the term "safety of
> any other person or the community."
> The reference to safety of any other
> person is intended to cover the
> situation in which the safety of a
> particular identifiable individual,
> perhaps a victim or witness, is of
> concern, while the language referring
> to the safety of the community refers
> to the danger that the defendant might
> engage in criminal activity to the
> detriment of the community.  The

> Committee intends that the concern about
> safety be given a broader construction
> than merely danger of harm involving
> physical violence....  The Committee
> also <u>emphasizes</u> that the risk that a
> defendant will <u>continue to engage</u> in
> drug trafficking constitutes a danger to
> the "safety of any other person or the
> community."

<u>Id</u>. (Emphasis added; footnotes omitted); <u>see</u> <u>United States v.</u>
<u>Patriarca</u>, 948 F.2d 789, 792, n.2 (1st Cir. 1991) (danger to
community does not refer only to risk of physical violence); <u>see</u>
<u>also</u> <u>United States v. Tortora</u>, 922 F.2d 880, 884 (1st Cir. 1990)
(stating danger in context of 18 U.S.C. § 3142(g) not meant to
refer only to physical violence); <u>United States v. Hawkins</u>, 617
F.2d 59 (5th Cir.), <u>cert. denied</u>, 449 U.S. 962 (1980)
(trafficking in controlled substances).[5]

The issue critical to determining whether to detain a
defendant is therefore, whether, with respect to the defendant,
based on the guidelines set forth <u>supra</u> in part C of this Order,
any condition or combination of conditions of release exist that
will reasonably assure the safety of any person and the
community; and the presence of the defendant.  18 U.S.C. §
3142(e).

---

[5] A defendant may be ordered detained as a danger to the safety of another or to the
community, however, only if the judicial officer determines that a detention hearing is
appropriate under the provisions of moved under 18 U.S.C. § 3142(f)(l), and the judicial officer
has determined that a hearing is appropriate under that latter section.  <u>See</u> <u>United States v. Ploof</u>,
851 F.2d 7 (1st Cir. 1988).

E.  "Where, as here, a defendant is charged with a
controlled substance offense punishable by a maximum term of 10
years or more, the government is aided by § 3142(e)'s rebuttable
flight presumption."[6]  United States v. Palmer-Contreras, 835
F.2d 15, 17 (1st Cir. 1987) (per curiam).  The presumption is not
limited to risk of flight.  Rather, the presumption has two
components.  One component is that the person poses a risk of
flight and the second component is that the person "represents a
danger to the community."  United States v. Moss, 887 F.2d 333,
335 n.3 (1st Cir. 1989) (per curiam).

Thus, under section 3142(e) the judicial officer must
consider the rebuttable presumption that no condition or
combination of conditions will reasonably assure the appearance
of the person as required and the safety of the community if the
judicial officer finds that there is probable cause to believe
that the person has committed an offense for which a maximum term
of imprisonment of ten years or more is prescribed by the
Controlled Substances Act or the Controlled Substances Import and
Export Act or an offense under 18 U.S.C. § 924(c), the use of a
firearm to commit a felony.  18 U.S.C. § 3142(e).

The presumption raised as a result of finding probable cause

---

[6] The presumption reflects Congressional findings that persons who deal in drugs often have
the necessary resources and foreign ties to escape to other countries.  United States v. Palmer-
Contreras, 835 F.2d 15, 17 (1st Cir. 1987) (per curiam).  Consequently, imposing "a large bond is
often ineffective in deterring flight."  United States v. Perez-Franco, 839 F.2d 867, 869-70 (1st
Cir. 1988).

that a defendant committed the relevant narcotics offense is
always entitled to evidentiary weight, the amount of which, if at
all, depends on the nature of the production by the defendant and
the other factors set forth under § 3142(g). The defendant,
however, "bears only the burden of production." United States v.
Perez-Franco, 839 F.2d 867, 870 (1st Cir. 1988). As explained by
the United States Court of Appeals with regard to the statutory
presumption of section 3142(e):

> Section 3142(e), however, only imposes a burden of
> production on a defendant. The burden of persuasion
> remains with the government. Nevertheless, even after
> a defendant has introduced some evidence to rebut the
> flight presumption, the presumption does not disappear,
> but retains evidentiary weight--the amount depending on
> how closely defendant's case resembles the congressional
> paradigm, Jessup, 757 F.2d at 387--to be considered along
> with other factors.

United States v. Palmer-Contreras, 835 F.2d at 17-18; see also,
United States v. Perez-Franco, 839 F.2d at 869-70.

Finally, it is important to note that the presumption is
triggered by the statutory penalty prescribed irrespective of the
actual or likely sentence imposed upon the particular defendant.
See United States v. Moss, 887 F.2d 333, 337 (1st Cir. 1989) (per
curiam). The fact that a defendant may receive a sentence of
less than ten years does not make the presumption inapplicable.
Id. at 337. Rather, this court may consider such a factor with
regard to the weight this court gives to the presumption. Id. At
337.

10

II.  The defendant, Ablolom Woldeslassie, is 22 years of age.[7]
He was born on August 2, 1982 in Khartoum, Sudan.  He is a
citizen of Ethiopia and permanent resident of the United States.
The defendant immigrated to this country with his family in 1984.
According to the Pretrial Services report, the defendant does not
have a passport.  He attended school in Boston and dropped out of
East Boston High School at the age of 18.

The defendant's parents live in Boston, albeit separately.
The defendant has three siblings, ages 23, 20 and 12.[8]  They
reside in a town house located at 50 Clifford Street in Roxbury
with the defendant's mother.  This residence is maintained
through the "Section Eight" program of the Boston Housing
Authority.  The defendant, who is single and has no children,
resided in Roxbury with his mother and siblings prior to his
arrest.

According to the Pretrial Services report, from June of 2003
until the time of his arrest the defendant was employed by
Uniscribe Professional Services, which provides duplicating
services in professional offices.[9]  The defendant's employment

---

[7] The information in this section is taken from the original Pretrial Services report and three additional reports prepared by Pretrial Services.

[8] The 12 year old is a foster child of the defendant's mother.

[9] The defendant's brother testified at the detention hearing that the defendant has not worked since August of 2003, when he was shot.

history also includes brief periods of employment at Bound
Business Solutions and D'Angelo's Sandwich Shop in Boston.

The defendant reports no assets and liabilities in the
amount of $930, including $150 in court costs.  In June of 2003
the defendant sustained a gun shot wound to his left thigh.  He
reports using marijuana every two or three days.

The defendant's criminal history reflects that in July of
2003 the defendant was charged with operating after suspension of
license in the Roxbury District Court.  Initially the case was
continued without a finding.  This case remains open.

In September of 2003 the defendant was charged in the same
court with possession of a Class D controlled substance.  This
case is unresolved.  In February of 2004 the defendant was
charged in the same court with possession of a Class D controlled
substance, possession with intent to distribute a Class D
substance, possession with intent to distribute a Class B
substance and having a controlled substance in a school zone.
These charges are also open.

The defendant's criminal history includes two defaults and
two violation notices.


III.  The relevant evidence at the detention hearing showed the
following.

The government called Officer Gregory Brown ("Brown") of the

12

Boston Police Department ("BPD"). He testified that he has been a member of the BPD for 17 years. For the past 11 years he has been assigned to the Youth Violence Gang Unit, where his responsibilities include gathering intelligence regarding violent drug trafficking.

In further testimony Brown stated that in the spring of 2003 he became involved in a multiagency law enforcement investigation focusing on the Copeland Street/Warren Gardens area of Roxbury. The investigation culminated in the above-captioned Indictment, which resulted in the arrest of the defendant on or about April 15, 2004. Brown noted that the investigation was commenced in response to complaints by residents of the area who reported the presence of guns, drugs, drug dealing and "shots fired."

According to Brown, during the course of the investigation police officers, serving as undercover agents ("UCs"), made "controlled buys" of crack cocaine. Brown explained how controlled buys are made and noted that surveillance was conducted before the UC entered the location of each controlled buy in order to identify individuals already in the area. Audio and video surveillance, utilizing fixed location and mobile handheld cameras, was conducted of most of the transactions.

Brown was shown a chart which was admitted as Government Exhibit # 1. Brown explained that the chart sets the forth in summary form all of the controlled buys made from the defendant.

13

Brown testified that the chart was produced by Task Force Agent
Monteiro, a special agent with the Drug Enforcement
Administration.  According to the chart, the defendant was
involved in five transactions between July 8, 2003 and September
11, 2003.  The total weight of the crack cocaine sold in the
transactions was 5.23 grams.  All but one of the transactions
were recorded.  In all of the transactions Officer Adolpho Brito
of the BPD was the UC.

In further testimony Brown stated that two controlled buys
were made from the defendant on July 8, 2003.  Brown was shown a
videotape from a camera focused on Copeland Street.  The tape,
which was marked as Government Exhibit # 2, was recorded at
approximately 5:46 p.m.  The tape was played in open court and
Brown provided narration for the events as they unfolded on the
video monitor.

According to Brown, the UC arrived on Copeland Street and
was approached by codefendant Worrell.  The UC indicated that he
wanted to purchase nine bags of crack cocaine.  Worrell indicated
that he only had six bags.  Worrell asked the defendant for three
bags.  Worrell then removed six bags from his mouth and gave them
to the defendant.  The defendant gave the six bags to the UC
along with three additional bags from the defendant.  The total
price for the nine bags was $200, which includes $50 that was
paid to the defendant.  Immediately thereafter the defendant sold

14

the UC an additional three bags for $50.

In further testimony Brown stated that ten minutes after the transaction he made observations and identified the defendant. He added that the UC reviewed a photo book and also identified the defendant.

Brown stated that another transaction took place on August 14, 2003.  Brown identified a videotape of the August 14, 2003 transaction, which was admitted as Government Exhibit # 3.  The tape was played in open court.  On the tape it is possible to observe the UC on Copeland Street, which, Brown testified, is less than 1000 feet from the Little Scobie Playground.  Brown testified that the defendant, who goes by the street name "Breeze," said that he was "dry."  The defendant advises the UC to speak to another person, codefendant Thompson, who thereafter sells $150 worth of crack cocaine to the UC with the assistance of a juvenile.

Brown testified that on September 10, 2003, another transaction involving the defendant took place on Warren Street near the Little Scobie playground.  According to Brown, the UC walked up Warren Street and was approached by the defendant.  The defendant did not have any drugs on his person.  The defendant asked a nearby juvenile if he could do the deal.  The juvenile replied affirmatively and the defendant said that he would speak to the juvenile and get the price that the UC requested.  The UC

15

wanted nine bags but the juvenile was only able to supply five bags.  The UC identified the juvenile and the defendant, according to Brown.

In further testimony Brown testified that on September 11, 2003, the defendant, who was on a bicycle, sold the UC 12 bags of crack cocaine for $200.  Brown identified a videotape, which was admitted as Government Exhibit # 4.  The tape was played in open court.  Brown noted that the actual transaction was not recorded on the tape, which shows the parties meeting just prior to the actual exchange and, again, just after the transaction is completed.  Brown noted that the transaction took place within 1000 feet of a playground.

On cross examination the videotape of the September 11, 2003 transaction was replayed and Brown was questioned about the identification of the defendant.  Brown was emphatic in his identification of the defendant on the tape.  Brown noted that he first met the defendant about two and one half years ago and over that time period they have probably had 17 to 18 encounters. Brown added that he has arrested the defendant in the past.

On further cross examination it was established that Brown did not see the transactions on July 8 and September 10, 2003, nor has he ever actually seen the defendant selling drugs, although he saw the defendant just prior to and/or just after certain transactions.

16

At the conclusion the government's case the prosecutor offered a multipage document from the agency formerly known as the United States Immigration and Naturalization Service ("INS")[10], which was admitted as Government Exhibit # 5.  The document confirms the defendant's status as a permanent resident alien of the United States.

At the resumed detention hearing on June 25, 2003, the defense called Tsega Abadi Desta ("Ms. Desta"), the defendant's mother, who testified that she was born in Ethiopia in 1963 and that she has been living in Roxbury for the last five years with her three biological children and a foster child in a single family home which she rents.  Ms. Desta testified that she is a permanent resident of the United States and that she has been employed for the last five years by two companies which provide document services to law firms.

Ms. Desta noted that she recently traveled to Sudan to visit her mother who resides in Eritrea.  Ms. Desta has a sister residing in Sudan and a brother, who is a United States citizen, residing in Boston.  She noted that the defendant does not speak any foreign language, that he did not graduate from high school and that he worked at the copy service facility of the Boston law firm of Mintz Levin Cohn Ferris Glovsky and Popeo, where he was a

---

[10]  The agency is now known as the Bureau of Immigration and Customs Enforcement of the Department of Homeland Security.

"good worker."

On cross examination it was established that the defendant never told his mother about ever being arrested or going to court. She acknowledged that she was not "exactly" sure of the nature of the current charges against the defendant.

On redirect examination Ms. Desta stated that the defendant always slept at home in the evening.

The defense called the defendant's brother Tesfalem Woldeslassie, who testified that he was born on September 10, 1980, in Eritrea[11], is a graduate of East Boston High School and is entering his second year at Dean College. The defendant's brother stated that he worked with the defendant at the copy center. He added that the defendant never missed work and he was not aware that the defendant had either a drug or alcohol problem. He added that he was not aware that the defendant had ever been arrested.

On cross examination it was established that the defendant stopped working at the copy center after he was shot in August[12] of 2003. The defendant's brother was not aware of the circumstances surrounding his brother's shooting other than the

---

[11] This court notes that the INS report (Government Exhibit # 5) indicates that the defendant's brother was born Gedaref, Sudan.

[12] The bulk of the evidence and defense counsel's proffer indicate that the defendant was shot in June of 2003, not August as the defendant's brother testified. This would suggest that the defendant's period of employment with the copy service was very brief.

fact that the defendant said that someone shot him.  He stated that he never saw the gun and was not aware if the defendant was licensed to have a gun.

After this testimony defense counsel proffered that the defendant sustained an accidental self-inflicted gunshot wound in June of 2003.  The incident occurred on Blue Hill Avenue and Waverly Street and the gun was never recovered.  Defense counsel noted that the defendant told his brother that he had been shot.

Defense counsel called the defendant's sister Selam Woldeslassie, who testified that she was born in 1983 in Sudan. She stated that finished her sophomore year at Roxbury Community College and that she currently works for Sprint.  She was not cross examined.

At the conclusion of the testimony the parties agreed to have a 12 page series of BPD documents marked as a joint exhibit. The documents were marked Joint Exhibit # 5.[13]  They include intelligence work sheets reflecting the sequence of the surveilled events during the July 8, 2003 drug transactions.

IV.  The return of the Indictment in the United States District Court for the District of Massachusetts in this case establishes the existence of probable cause that the defendant committed the crimes for which he is charged in the Indictment.

---

[13] This exhibit was misnumbered and should be Joint Exhibit # 6.

The United States has moved for detention pursuant to 18 U.S.C. §§ 3142(d)(1)(A)(i), (f)(1)(C) and (f)(2)(A). The government must prove by clear and convincing evidence that if released the defendant would pose a serious danger to any person or the community. In contradistinction, the government must demonstrate only by a preponderance of evidence that the defendant, if released, constitutes a serious risk of flight or failure to appear. The two different standards are used because of the clear language expressed in the last paragraph of 18 U.S.C. § 3142(f) which states "that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." Congress, by not attaching that language to the risk of flight clause, infers that a lower standard of proof is all that is necessary to establish the government's case.

A. <u>Danger to the Community</u>

This court first addresses the likelihood that the defendant, if released, would be a danger to another person or the community.

The government's case against the defendant is strong. The defendant was involved in five transactions in which he sold or arranged to sell crack cocaine to an undercover law enforcement

agent.  Most of the transactions were recorded on audiotape
and/or videotape.

In addition at the time of the drug transactions charged in
the Indictment the defendant was on release from the Roxbury
District Court.  More specifically, the defendant appeared in the
Roxbury District Court on July 8, 2003 and was released.  The
conduct charged in Count Two of the Indictment occurred before
6:00 p.m. on the very same day.  Obviously the defendant's
encounter with the court system in no way deterred him from
further unlawful behavior, not even for a day.

This court is also concerned by the fact that in June of
2003, just a month before the first event charged in the
Indictment, the defendant was in the unauthorized possession of a
firearm, which apparently discharged accidently injuring him.  It
would appear that the defendant was less than candid with the
authorities and even with his family regarding the circumstances
of the shooting.  Too often drug dealing and guns come together
in a lethal combination.  Despite having a caring and supportive,
although somewhat uninformed, family the defendant appears to
have engaged in a continuous course of reckless behavior
constituting a danger to the community.

The defendant did not proffer any credible evidence to
detract from the government's assertion that he has committed a
serious drug crime involving a narcotic drug and that he is a

danger to the community or any person.  This court finds by clear
and convincing evidence that there is no condition or combination
of conditions that will assure the safety of any person or the
community if the defendant is released.


     B. <u>Risk of Flight</u>

    Next, this court turns to risk of flight or failure to
appear.

    Although the defendant is a citizen of Ethiopia, it is
unlikely that he would return there to avoid prosecution.  A
review of the INS report indicates that he came to this country
as a "refugee."  In addition he does not appear to have financial
resources nor does he speak the language.

     However, this court does have some concern whether he would
appear as required.  His prior criminal history reflects two
defaults and two violation notices in less than twelve months.
In his short but significant criminal history he appears have
been less than candid with his family about his arrests and to
have disregarded his duty to appear and to abide by conditions of
release.

    Based on the totality of the circumstances this court finds
by a preponderance of the evidence that there is no condition or
combination of conditions that will assure the appearance of the
defendant as required.

V. <u>Conclusion</u>

The government has satisfied this court by clear and convincing evidence that no condition or combination of conditions of release (set forth under 18 U.S.C.§ 3142(b) or (c)) will reasonably assure the safety of any other person or the community if the defendant is released.  In addition, this court has found, at least by a preponderance of the evidence, that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

Having evaluated the factors set forth in 18 U.S.C. § 3142(g), this court orders the defendant detained subject to the following conditions:

> (1)  The defendant be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

> (2)  The defendant be afforded reasonable opportunity for private consultation with his counsel; and

> (3)  On Order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined shall deliver the defendant to an

authorized Deputy U.S. Marshal for the purpose of any
appearance in connection with a court proceeding.


_____/s/_____
**MARIANNE B. BOWLER**
Chief United States Magistrate Judge