1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3      * * * * * * * * * * * * * *
       *UNITED STATES OF AMERICA    *
4                                   *    CRIMINAL ACTION
                     v.             *    No. 04-10112-RGS
5      *                            *
       ABLOLOM T. WOLDESLASSIE      *
6                                   *
       * * * * * * * * * * * * * *
7

8

9

10                BEFORE THE HONORABLE RICHARD G. STEARNS
                      UNITED STATES DISTRICT JUDGE
11                           PLEA HEARING
                          November 21, 2006
12

13     APPEARANCES:

14            UNITED STATES ATTORNEY'S OFFICE, (By AUSA David
           Tobin) 1 Courthouse Way, Suite 9000,  Boston,
15         Massachusetts  02210, on behalf of the United States
of
           America
16
              GRAYER & DILDAY, LLP, (By James S. Dilday, Esq.,
17         and Holly Robinson, Esq.) 27 School Street, Boston,
           Massachusetts 02108, on behalf of Defendant
18

19

20                              Courtroom No. 21
                                1 Courthouse Way
21                              Boston, Massachusetts 02109

22

23                     James P. Gibbons, RPR, RMR
                        Official Court Reporter
24                 1 Courthouse Way, Suite 7205
                    Boston, Massachusetts  02210
25                         (617) 428-0402

2

1                    P R O C E E D I N G S

2                    THE CLERK:  This is United States of
America

3      versus Ablolom Woldeslassie, Criminal No. 04-10112.

4            Would counsel please identify themselves for the

5      record.

6                    MR. TOBIN:  Good afternoon, your Honor.
David

7      Tobin on behalf of the United States.

8          MR. DILDAY:  Good afternoon, your Honor.

9      James Dilday for Mr. Ablolom Woldeslassie.  To my far

left

10     is Attorney Holly Robinson.

11          MS. ROBINSON:  Good afternoon, your Honor.

12          THE COURT:  I understand, Mr. Dilday, that

13     your client is offering to plead guilty to Counts Two,

Three

14     and Eight, on the understanding that the government will

15     dismiss Counts Five and Seven?

16          MR. DILDAY:  That's correct, your Honor.

17          THE COURT:  Okay.

18          THE CLERK:  Mr. Woldeslassie, Count Two of

the

19     superseding indictment charges you with distribution of

20     cocaine base, on or about July 8, 2003, at Boston, in the

21     District of Massachusetts, all in violation of Title 21,

22     United States Code, Section 841(a)(1); Title 21, United

23     States Code, Section 860(a); and Title 18, United States

24     Code, Section 2, to which count you have previously pled

25     "not guilty."

3

1          Do you now wish to change your plea?

2          THE DEFENDANT:  Yes.

3          THE CLERK:  How do you plead to Count Two

of

4      the superseding indictment?

5          THE DEFENDANT:  Guilty.

6          THE CLERK:  Count Three of the superseding

7      indictment charges you with distribution of cocaine base,

on

8      or about July 8, 2003, at Boston, in the District of

9      Massachusetts, all in violation of Title 21, United

States

10     Code, Section 841(a)(1), and 860(a); and Title 18, United

11     States Code, Section 2, to you which Count you have

12     previously pled "not guilty."

13          Do you now wish to change your plea?

14          THE DEFENDANT:  Yes.

15          THE CLERK:  How do you plead to Count Three
of

16     the superseding indictment?

17          THE DEFENDANT:  Guilty.

18          THE CLERK:   And Count Eight of the
superseding

19     indictment charges you with distribution of cocaine base,
on

20     or about September, 11, 2003, at Boston, in the District
of

21     Massachusetts, all in violation of Title 21, United
States

22     Code, Section 841(a)(1); 860(a); and Title 18, United
States

23     Code, Section 2, to which count you have previously pled

24     "not guilty."

25          Do you now wish to change your plea?

4

1          THE DEFENDANT:  Yes.

2          THE CLERK:  How do you plead to Count
Eight?

3          THE DEFENDANT:  Guilty.

4          THE CLERK:  Would you raise your right
hand,

5     sir.

6          ABLOLOM T. WOLDESLASSIE, sworn.

7          THE CLERK:  If you would take a seat right
up

8     there, Mr. Woldeslassie, and, Mr. Dilday and Ms.
Robinson,

9     if you want to stand beside him.

10          (Pause in proceedings.)

11          THE COURT:  Mr. Woldeslassie, my name is

12     Richard Stearns.  I'm a judge of the United States
District

13     Court.

14          I'm going to ask you some questions, and the
reason
15     for the questions is that I have to make my own

16     determination that your decision to plead guilty is a

17    voluntarily one, and one made with full knowledge of the

18    consequences of pleading guilty.

19        So if any question I ask seems imprecise or is

20    confusing, ask me to rephrase it, or feel free to consult

21    with your attorney before responding, okay?

22            THE DEFENDANT:  Thank you.

23            THE COURT:  Would you tell us your full name

24    for the record.

25            THE DEFENDANT:  Ablolom Woldeslassie.

5

1            THE COURT:  Mr. Woldeslassie, how old are you?

2            THE DEFENDANT:  Excuse me?

3            THE COURT:  How old are you?

4            THE DEFENDANT:  Twenty-four.

5            THE COURT:  Were you born in Boston?

6            THE DEFENDANT:  No.

7            THE COURT:  Where were you born?

8            THE DEFENDANT:  Khartoum, Sudan.

9            THE COURT:  In Khartoum?

10            THE DEFENDANT:  Yes.

11            THE COURT:  When did you emigrate to the US?

12            THE DEFENDANT:  When I was about a year and a

13    half, two years old.

14            THE COURT:  So you wouldn't have any memory of

15    Khartoum?

16            THE DEFENDANT:  No.

17            THE COURT:  I've actually been in Khartoum not

18    too long ago, but if you came here at a year and a half, I

19    don't think you would have any viable memory today.

20            THE DEFENDANT:  No

21            THE COURT:  Did you go to school in the

Boston

22    area?

23                    THE DEFENDANT:  Yes.

24                    THE COURT:  How far did you go in school?

25                    THE DEFENDANT:  To the 12th grade.



6

1                     THE COURT:  Did you graduate?

2                     THE DEFENDANT:  No.

3                     THE COURT:  What did you do when you left

4    school?

5                     THE DEFENDANT:  Find work.

6                     THE COURT:  What kind of work have you

done?

7                     THE DEFENDANT:  I've done cashier at

8    D'Angelo's, also worked at Balanced Business Solutions,

9    Uniscribe Office Solutions.  I've done mail carrying,

10   special requests.

11                    THE COURT:  Your family is still in the

Boston

12   area?

13                    THE DEFENDANT:  Yes.

14                    THE COURT:  Both of your parents are

living?

15                    THE DEFENDANT:  Yes.

16                    THE COURT:  Brothers and sisters?

17                    THE DEFENDANT:  Yes.

18                    THE COURT:  You're not married, are you?

19                    THE DEFENDANT:  No.

20                    THE COURT:  This question is not intended

to

21   be embarrassing.  It's one I'm required to ask you.

22                Have you ever been treated for a mental

condition

23   or psychological problem?

24                    THE DEFENDANT:  No and yes.

25                    (whereupon, the defendant and his counsel

7

1    conferred.)

2                    THE COURT:  I don't mean to pry, but just

3    generally could you tell me what --

4                    THE DEFENDANT:  I think it was in
elementary

5    school, but I went to go see the psychologist.  He was
just

6    showing me ink blots and stuff.  I don't know if
everybody

7    in the school went to go see this guy, but I also did.

8                    THE COURT:  Probably.

9              But there is no --

10                   THE DEFENDANT:  No --

11                   THE COURT:  -- issue that you're aware of
that

12    affects your thinking ability?

13                   THE DEFENDANT:  No.

14                   THE COURT:  Are you taking any prescribed

15    medication?

16                   THE DEFENDANT:  No.

17                   THE COURT:  So, as you sit here, your mind
is

18    clear, and you have no difficulty comprehending the

19    proceeding?

20                   THE DEFENDANT:  Yes, your Honor.

21                   THE COURT:  I'm sure you have, because he
is

22    very thorough, but have you reviewed the indictment with

23    Mr. Dilday?

24                   THE DEFENDANT:  Yes, I have.

25                   THE COURT:  Let me stress that an
indictment



8

1    itself is not evidence of a crime.  It's just simply a

2    formal notice to a person that he's been charged with a

3    federal offense and has to respond in court.

4              These offenses are all of the same type, that
is,

5     the same statute is alleged in each offense.  And
basically

6     the indictment alleges that on different days, the three

7     days specified, that you possessed with the intent to

8     distribute and, in fact, distributed what is described as

9     cocaine base formally in the law, something that most
people

10    would call "crack cocaine;" that it was done within a

11    thousand feet of real property constituting a playground,
in

12    this case the Little Scobie Playground as the playground

13    that's alleged.

14         What the government would have to show is that
you

15    were aware of the fact that the substance that you had
was a

16    controlled substance, in the sense that it was one that
was

17    regulated by law and the distribution of which was

18    prohibited by law.

19         A "distribution" under federal law is a transfer
of

20    possession, usually for consideration, money, but a gift
is

21    sufficient actually under the law to constitute a

22    distribution.

23         The government would also have to prove that you

24    were within a thousand feet of the specified playground.
It

25    doesn't have to prove that you knew you were within a

9

1     thousand feet of the playground, but they would have to
show

2     that the transaction, in fact, occurred, as alleged in
the

3     indictment, within a thousand feet of a playground.

4          These are the essential, what lawyers would call

5     "elements," or components of the crime that the
government

6     would have to prove beyond a reasonable doubt if the case

7     proceeded to trial.

8          Do you feel familiar with the nature of the
charge

9     and the elements of the offenses?

10              THE DEFENDANT:  Yes.

11              THE COURT:  Mr. Tobin, would you tell us
what

12    the maximum statutory penalty is.

13              MR. TOBIN:  Yes, your Honor.

14         The following is the maximum statutory penalty
for

15    each of the three counts of the indictment to which the

16    defendant is pleading guilty:

17         A maximum period of incarceration of 40 years'

18    imprisonment; a fine of $2 million; supervised release of
at

19    least six years, and possibly for the duration of the

20    defendant's life, and the $100 special assessment for
each

21    count.

22         I will note that there is also a one year
minimum

23    mandatory because of the school zone that's alleged or

24    charged in each count, and, obviously, although that's
the

25    maximum sentence that I just articulated for each count,


10

1     they can be run concurrently, as I understand it.

2              THE COURT:  Mr. Woldeslassie, do you

3     understand that these are the maximum penalties that the

4     statute prescribes?

5              THE DEFENDANT:  Yes.

6              THE COURT:  In a minute I want to talk to
you

7     a little bit about sentencing and how it proceeds.

8         Again, Mr. Dilday, there is no plea agreement in

9     this case, other than the agreement with respect to the

10    dismissal of the two remaining counts?

11              MR. DILDAY:  There is no written agreement

12    with respect to the dismissal, just an informal

13    understanding amongst the lawyers.

14              THE COURT:  And that informal understanding
is

15    with respect to Counts Five and Seven?

16              MR. DILDAY:  Yes, your Honor.

17              THE COURT:  Mr. Woldeslassie, do you

18    understand that these offenses are what the law
classifies

19    as "felonies," that is, crimes that have potentially more

20    than a year of incarceration attached to them?

21         A felony crime has certain, what lawyers would
say,

22    collateral consequences attached to it.  Conviction of a

23    felony crime impacts on certain civil rights, such as the

24    right to serve on a jury, the right to vote, the right to

25    hold public office.  Perhaps I should stress also the
right
 

11

1    to possess a firearm of any kind.  It's a very serious

2    offense under both federal and state law to be found in

3    possession of a firearm after a felony conviction.

4         Do you understand that?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Let me explain.

7              Sentencing in the federal courts has undergone
8    significant changes within the last two years.

9              Beginning in the 1980s, federal judges have
largely

10    operated under something called the United States
Sentencing

11    Guidelines.  These were created by a Commission
established

12    by Congress in the mid 1980s to try to bring more
uniformity

13    to sentencing practices by federal judges.  And
essentially

14    the solution that was seized upon by the Commission was
to

15    restrict the discretion that federal judges could bring
to

16    matters of sentencing.  And the way that was accomplished

17    was by guidelines, and they were pretty much what they
sound

18    like.

19         Essentially the Commission went through the
Federal

20    Criminal Code and classified offenses on what they called
an

21    "offense level," really a scale, of 1 to 43.  One being
the

22    least serious of federal crimes; 43 being the most
serious

23    crime that can be imagined.

24         Then a series of adjustments were built into the

25    scale, depending upon a person's prior criminal record,



12


1    which would cause an upward adjustment in the sentence.

2         Other factors, like accepting responsibility,
which

3    you're doing today, caused, and still does, a lowering of

4    the guideline range that otherwise applies to an offense.

5         This so-called offense level, after all of the

6    appropriate adjustments are made, was particularly
important

7    because it then is queued to a range of months expressed
as

8    a minimum and as a maximum, and in most circumstances
judges

9    were expected to observe that sentencing range, no less
than

10    the minimum, no more than the maximum.

11         There were exceptions where a judge could exceed
or

12    impose a sentence lower than what the Guidelines specify,

13    but as these Guidelines, frankly, were interpreted by the

14    courts of appeals over time, those exceptions began to

15    narrow and be more and more strictly construed until we

16    reached the point where, at least in the eyes the Supreme

17    Court, these were no longer guidelines.  They had almost

18    become statutes in and of themselves, with very little

left

19    for the judge to do by way of exercising discretion over

20    sentencing.

21         The Supreme Court two years ago essentially held

22    that, so construed, the Guidelines, were
unconstitutional.

23    They were too much of an infringement upon the historical

24    discretion judges had exercised in sentencing matters.

25         Not that they don't contain a lot of experience
and
⏐

13

1    even wisdom in the eyes of the Supreme Court, but the

2    Supreme Court said we will not accept as constitutional
--

3         (Whereupon, the fire alarm sounded.)

4         THE COURT:  We should suspend.

5         (Pause in proceedings.)

6         (Whereupon, the Court and marshal conferred.)

7         THE COURT:  Why don't we suspend for five

8    minutes or so until we get the noise under control.

9         (Whereupon, the building was evacuated due to
the

10    fire alarm.)

11         (Recess.)

12         THE CLERK:  Court is in session.

13         Please be seated.

14         THE COURT:  Mr. Woldeslassie, I think when
we

15    left I was explaining about the change that the Supreme

16    Court had instituted regarding the Guidelines.

17         The point I wanted to make though is the
Guidelines

18    haven't lost all meaning.

19         The Supreme Court recognized that a lot of

20    experience had been distilled into the Guidelines.  So as
I

21    interpret what the Supreme Court is instructing us to do
is

22    to begin with the Guidelines; that is, decide what the

23    guideline sentence would be.  Having made that

24    determination, we still have to exercise discretion.  We

25    have to ask ourself, is this a reasonable result?

14

1    If it's reasonable, then the Guidelines supply
the

2    range in which the judge is going to sentence.

3    If, for whatever reason, the judge thinks that
the

4    result is not reasonable, we now have the freedom to look

5    back to the historical common law considerations that
judges

6    had exercised before the Guidelines' system, and these
are

7    somewhat, but not fully, set out in the statute in the

8    United States Code which directs us to look at the nature
of

9    the offense, the characteristics of the defendant,
whether

10    what would be required to ensure deterrence to others who

11    might be tempted by the same crime, the need for

12    rehabilitation and opportunities the defendant might have

13    for rehabilitation.

14    These are all considerations, and that's not a
full

15    list, of factors that judges historically had considered

16    before the Guidelines' regime in imposing sentence.

17    My practice is to more or less follow that

18    procedure.  I will look first to the Guidelines, ask
myself,

19    Is this a reasonable result?  If for whatever reason I
don't

20    think so, then I will look to the common law and
statutory

21    factors.

22    While I cannot promise you any given result, the

23    one promise that I will give you is if for any reason I
were

24    to conclude that a sentence imposed should be greater
than

25      what the Guidelines recommend, I will permit you to withdraw

15
1     your plea at that point.

2                   The one thing I do need for you to understanding is

3     that if I impose a lawful sentence, simple dissatisfaction

4     with the discretion that I now can exercise and the way I

5     exercise it is not a basis on which a plea can be withdrawn.

6                   Do you understand that?

7                   THE DEFENDANT:  Yes.

8                   THE COURT:  Do you understand that when you

9     plead guilty you give up your right to have your case tried

10     before a jury?

11                   THE DEFENDANT:  Yes.

12                   THE COURT:  Have you ever served as a juror or

13     seen a jury trial?

14                   THE DEFENDANT:  No, I haven't, your Honor.

15                   THE COURT:  A federal jury trial looks very

16     much like a state jury trial.  In fact, our jurors are

17     chosen by the State Jury Commissioner.  We draw from the

18     same jury pool.  We just draw from a broader geographical

19     area, given the nature of the court.

20                   Essentially, a computer randomly selects a group of

21     citizens who are instructed to appear here in the courtroom

22     on the day scheduled for trial.

23                   We then -- and when I say "we," you, your lawyers,

24     the government's lawyer, and I -- interview the jurors to

25     determine and to find 12 initially who are eligible to sit

16

1     on the case.

2          In the process of ultimately selecting the final

3     12, you and your attorneys are permitted to object to any

4     ten potential jurors you do not want seated for any
purpose,

5     as the government can object to any six it does not want

6     seated.

7          The jury is required to be unanimous as to
whether

8     a defendant is guilty or not guilty of a crime.

9          So when I say you give up your right to a jury

10    trial, I mean not only the right to have a jury make the

11    ultimate determination as to whether you are guilty or
not

12    guilty of each of the offenses, but also the right to

13    participate in the selection of the very jury that would

14    make that decision.

15          Do you understand that?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Do you understand that you
would

18    have the right to the assistance of counsel throughout
the

19    jury selection process and throughout the trial of the
case?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Do you understand that I would

22    instruct the jury that they must presume you innocent,

23    unless or until the government succeeded in proving your

24    guilt beyond a reasonable doubt?

25          THE DEFENDANT:  Yes, your Honor.



17



1          THE COURT:  Do you understand that the
burden

2     of proof in a criminal trial is proof beyond a reasonable

3     doubt, a very heavy burden which the government carries

4     throughout the trial?

5          THE DEFENDANT:  Yes, your Honor.

6          THE COURT:  Do you understand that, because

have
7       the burden of proof rests on the government, you would

to
8       no obligation to prove your innocence, to call witnesses,

9       produce evidence, nor could you be forced to testify at
10      trial?
11                      THE DEFENDANT:  Yes, your Honor.
12                      THE COURT:  Do you understand, on the other
13      hand, by pleading guilty you give up the right, or the

you
14      potential right, to testify in your own defense should

15      choose to do so?
16                      THE DEFENDANT:  Yes, your Honor.
17                      THE COURT:  Do you understand that you give

up
means
18      the right to confront the witnesses against you?  That

19      to have your lawyers ask questions of the government's
20      witnesses.
21                      THE DEFENDANT:  Yes, your Honor.
22                      THE COURT:  And do you understand that at

right
23      least for purposes of this proceeding you give up the

24      to remain silent?
25                      THE DEFENDANT:  Yes, your Honor.


18


1                       THE COURT:  I will ask the prosecutor to

three
2       summarize the factual basis on which he relies for the

3       counts in the indictment to which you've offered pleas of

with
4       guilty.  When he finishes, I have to ask if you agree

go
5       the important allegations, that is, the allegations that

6       to the elements of the crime that he outlines.
7            Mr. Tobin.

gone
8                       MR. TOBIN:  Your Honor, if this case had

following
9       to trial, the United States would have proven the

10    beyond a reasonable doubt:

11            With regard to Count Two, the United States would

12    have proven that on July 8, 2003, an undercover Boston

13    Police officer, Adolfo Brito, walked down Copeland Street in

14    the Roxbury neighborhood of Boston.

15            While on Copeland Street, Officer Brito waved to

16    co-defendant Roland Worrell, who he knew from previously

17    purchasing crack cocaine from Mr. Worrell.

18            Mr. Worrell asked Officer Brito what he wanted?

19            Officer Brito replied, Nine for 150.

20            That was a reference to nine pieces of crack

21    cocaine for $150.

22            Roland Worrell waved to this defendant, Ablolom

23    Woldeslassie.  At that point Mr. Woldeslassie walked up to

24    Officer Brito and Mr. Worrell.  Mr. Woldeslassie was

25    accompanied by Co-defendant Teal.

19

1             Mr. Teal asked the undercover officer what he

2     wanted.  Mr. Worrell stated that the undercover officer,

3     Officer Brito, wanted the "Same thing as last time." This

4     is a reference to a previous purchase of crack cocaine which

5     this defendant is not charged with and was not involved

6     with.

7             The undercover officer, Officer Brito, stated twice

8     that he wanted nine for 150.

9             Mr. Teal, who had individually wrapped portions of

10    crack cocaine in his mouth, turned away and spit six plastic

11    bags of crack cocaine out of his mouth into his own hand.

12            Mr. Teal then turned to Mr. Woldeslassie and

13    asked -- or instructed Mr. Woldeslassie -- to borrow or to

14    give Mr. Teal -- asked Mr. Woldeslassie to give Mr. Teal

15    three.

16        Essentially, Mr. Teal had six.  The undercover

17    officer wanted to buy nine.  Mr. Teal needed three more

bags

18    to consummate the deal and asked Mr. Woldeslassie for

those

19    three.

20        At that point, Co-defendant Worrell essentially

21    butted in and suggested that Teal split the deal with

22    Mr. Woldeslassie, saying words to the effect, You take

100

23    and give him 50.  Meaning, Mr. Teal, you take $100 for

your

24    six, borrow three for Mr. Woldeslassie, and he'll take

$50.

25        At that time Mr. Teal took his six bags, which

he



20

1    had in his hand, and gave those six bags to

2    Mr. Woldeslassie, who took three bags out of his own

mouth.

3        Now Mr. Woldeslassie was holding nine bags, and

4    Mr. Woldeslassie gave all nine of the bags to Undercover

5    Officer Brito.

6        Officer Brito then took out $150 in United

States

7    currency, gave that money to Mr. Woldeslassie, and

Officer

8    Brito, the undercover, walked up and sat on the front

steps

9    of 12 Copeland Street.

10        This transaction involved a total of 1.5 grams

of

11    crack cocaine for the testing at the DEA laboratory in

New

12    York.  It was within 1,000 feet of the Little Scobie

13    Playground, which was at the end of Copeland Street, the

14    street where this transaction occurred.

15        Now, your Honor, with regard to Count Three,

that

16      also took place on July 8, 2003, in the same general

17      vicinity as the first buy on this day, that being
Copeland

18      Street in the Roxbury neighborhood of Boston.

19              Essentially what happened, and what the
government

20      would prove for Count Three, is that after the first deal

21      that I've just described was consummated and Officer
Brito

22      was seated on the steps in front of 12 Copeland Street,

23      Officer Brito realized that he had an additional $50 in
buy

24      money, money that had been provided to him to buy crack

25      cocaine that day on Copeland Street.



21

1               Once realizing that he had $50 remaining, he
again

2       waived to Mr. Worrell, who walked over to Officer Brito.

3               Officer Brito asked Mr. Worrell if he could get

4       three for $50, again meaning three additional pieces of

5       crack cocaine for $50.

6               Worrell told Officer Brito to hold on, and
walked

7       back to the group of males with whom Mr. Worrell had been

8       standing some distance from the stairs at 12 Copeland

9       Street.

10              When Mr. Worrell walked over to the group of
young

11      males, one of whom was Mr. Woldeslassie, he then spoke to

12      Mr. Woldeslassie.

13              Mr. Woldeslassie then left that group of males,

14      walked over to where Brito, Officer Brito, was seated on
the

15      steps, and at that time and at that location Officer
Brito

16      asked Mr. Woldeslassie if he could get three for $40.
And

17      then, based on the expression on Mr. Woldeslassie's face,

18      Officer Brito changed that request to three for $50,
again

19    three pieces of crack cocaine for $50.

20          Mr. Woldeslassie agreed and spit three bags into

21    Officer Brito's hand, three bags of crack cocaine.

22          At that point Officer Brito handed Mr.
Woldeslassie

23    $50.

24          Officer Brito asked Mr. Woldeslassie his name.

25    Mr. Woldeslassie replied that people called him "AB," but

22

1     that on the block they called him "Breeze."

2           This second deal, Count Three, if you will, on

3     July 8 was 0.54 grams, slightly more than a half of gram,

4     and this too was within a thousand feet of the Little
Scobie

5     Playground.

6           Your Honor, now with regard to Count Eight, the

7     third and final count that the defendant is pleading
guilty

8     to, the evidence would prove that on September 11, 2003,

9     again Undercover Officer Brito was on Copeland Street
when

10    this defendant, Mr. Woldeslassie, who was on a bicycle,

11    called to the officer.

12          Mr. Woldeslassie asked the officer how much he
was

13    looking for, and Officer Brito replied, 14 for 200.

14          Mr. Woldeslassie told the officer to sit down.

15    Mr. Woldeslassie then put aside the bicycle he had been
on

16    and disappeared into a nearby alley.  A short time later

17    Mr. Woldeslassie exited the alley, got on the bike, and
told

18    Officer Brito to follow him up Copeland Street and down
an

19    intersecting street.  Officer Brito did so.

20          When Mr. Woldeslassie stopped, Mr. Woldeslassie

21    informed Officer Brito that he only had 11 bags for $200,

22    but would make it up in the next deal.

23          Officer Brito said that he wanted 12, and

24      Mr. Woldeslassie said, Okay.

25          At that point Mr. Woldeslassie spit numerous
bags

23

1       into Officer Brito's hand, and told Officer Brito to put

2       them away because it was hot out there.  It was actually
12

3       bags that he spit out.  At that point Officer Brito gave

4       Mr. Woldeslassie the $200 in US currency that the two had

5       negotiated.

6           Testing of those bags, if you will, showed that
it

7       was 1.3 grams of crack cocaine or cocaine base, and that

8       this location as well was within a thousand feet of the

9       Little Scobie Playground.

10          Your Honor, in a very summary fashion, or in a

11      nutshell fashion, those would be the facts that the
United

12      States believes it could prove beyond a reasonable doubt
to

13      support the three counts to which the defendant is
pleading

14      guilty.

15              THE COURT:  So the government is alleging
more

16      than three but less than 4 grams of cocaine base?

17              MR. TOBIN:  Yes, your Honor.  The math

18      actually comes out to -- and I had just done that a
moment

19      ago.

20              THE COURT:  3.34?

21              MR. DILDAY:  I had 3.34, your Honor.

22              THE COURT:  That's what I have.

23              MR. TOBIN:  I believe that's accurate.

24              THE COURT:  That would be a Level 22 base

25      offense?

24

1        MR. DILDAY:  Yes, your Honor.

2        MR. TOBIN:  Yes.  3.34 grams results in a
base

3    offense level of 22.

4        THE COURT:  Mr. Dilday, do you have a

5    prediction as to the prior criminal history?

6        MR. TOBIN:  I'm sorry?

7        THE COURT:  No, I was asking Mr. Dilday.

8        Which criminal history category would apply?

9        MR. DILDAY:  One.

10       MR. TOBIN:  I agree with that.

11       THE COURT:  So it's basically a 30-to-37
month
12   Guideline sentence, as I understand it?

13       MR. DILDAY:  Yes, your Honor.

14       MR. TOBIN:  Well, and again just for the

15   record, your Honor, I know there was a preplea
presentence

16   report.  It's my understanding that Ms. Marcy is going to

17   make some changes to it, and I also believe that neither

18   Mr. Dilday nor I have taken the opportunity, given the

19   stature of the case, to file objections.  So that is
still

20   somewhat up in the air.

21       I would agree at this juncture the defendant is

22   pleading guilty to 3.34 grams of crack.

23       I will point out, and, of course, I pointed this

24   out to Mr. Dilday all along in our negotiations, the
United

25   States still anticipates that upon sentencing we will
either



25

1    put evidence on or we will argue for the cocaine from the

2    other two transactions as relevant conduct to the charges
of

3    conviction.  So I will point out, and this is, I'm sure,

4    obvious to the Court, the total weight, even if it gets
over

5  five grams, would not implicate a five-year minimum

6  mandatory, because no conspiracy is counted and no single

7  distribution is for an excess of five grams.

8      THE COURT:  I will certainly listen to what

9  both sides have to say.  I tend to be pretty strict on

10  relevant conduct, but that's a matter we'll confront at

11  sentencing.

12      But for our purposes now, Mr. Woldeslassie, what

13  the government is saying, if I can distill it down, that
on

14  two occasions on July 8, 2003, either directly or in

15  partnership with Mr. Teal, and again on an occasion on

16  September 11, 2003, you sold crack cocaine to someone
who,

17  obviously unbeknownst to you, was an undercover police

18  officer, and that to what you are pleading, the amount is
a

19  little over three but less than four grams of crack
cocaine.

20      Is that essentially true?

21      THE DEFENDANT:  Yes, your Honor.

22      THE COURT:  Are you pleading guilty
willingly,

23  freely and voluntarily?

24      THE DEFENDANT:  Yes, your Honor.

25      THE COURT:  Has anyone coerced you in a



26

1  physical sense into pleading guilty?

2      THE DEFENDANT:  No, your Honor.

3      THE COURT:  Have any promises, other than
the

4  promise with respect to the two outstanding counts, been

5  made to induce you to plead guilty?

6      THE DEFENDANT:  No, your Honor.

7      THE COURT:  Have any threats been made,
other

8  than, obviously, the threat of being prosecuted?

9      THE DEFENDANT:  No, your Honor.

10          THE COURT:  Have you had sufficient time to

11  discuss with your attorney the charges in the case, your

12  rights, your possible defenses and the consequences of

13  pleading guilty?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Do you feel Mr. Dilday has acted

16  at all times in your best interest?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Mr. Dilday, any reason you're

19  aware of why I should not accept the plea?

20          THE DEFENDANT:  No, your Honor.

21          THE COURT:  Mr. Woldeslassie, have I confused

22  you by any question I asked or anything I said?

23          THE DEFENDANT:  No, your Honor.

24          THE COURT:  You're pleading guilty because you

25  are guilty and, under the circumstances, given the



27

1  government's evidence, you think it's in your best interest

2  to take advantage of the guilty plea?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Counsel, are there any areas I may

5  have overlooked?

6          MR. DILDAY:  I have nothing, your Honor.

7          MR. TOBIN:  No, your Honor.

8          THE COURT:  Would you all mind stepping back

9  to counsel table.

10          (Pause in proceedings.)

11          THE COURT:  All right.

12      I find that the defendant is well oriented, that

13  his answers have been fully responsive to my questions.

14      I find that he understands the nature of the

15  charges and the potential penalties that they carry.

16          I find that he is competent to enter the plea and

17     has done so with the full understanding of his rights and

18     the consequences of waiving those rights.

19          In sum, I find that the plea is offered voluntarily

20     and with full knowledge of its consequences.

21          I find that the facts with respect to these three

22     counts as recited by the government would be sufficient to

23     warrant a finding of guilt beyond a reasonable doubt by a

24     jury.

25          Therefore, I will accept the pleas.



28

1          Mr. Dilday, is the defendant in custody or not?

2               MR. DILDAY:  Yes, he is, your Honor.  He's

3     been in custody since, I think, August of 2005.

4               THE COURT:  2005?

5               MR. DILDAY:  Sorry, 2004.

6          April.

7               THE COURT:  April 15 of 2005?

8               MR. DILDAY:  2004, because I got involved in

9     2005.  So April of 2004.

10               THE COURT:  Well, if he's been in custody that

11     long, I mean, depending on how the relevant conduct issue is

12     resolved, I think it's in his interest to get him

13     sentenced --

14               MR. DILDAY:  As quickly as possible.

15               THE COURT:  He is very close to eligibility.

16               MR. DILDAY:  That was my thought, that with

17     this relevant conduct of 3.34, he could be ripe for maybe a

18     time-served sentence.

19               THE COURT:  All right.

20          Well, let's do it sooner.  We already have the

21  basic presentence report.  I understand there will be
some

22  amendment and refinement made to it.

23          MR. DILDAY:  If I could grab my calendar
for a

24  second.

25          (Pause in proceedings.)



29

1          THE COURT:  I would like to set the
sentencing

2  early, say early in January, because I want to see how
close

3  he proves to be to the release date.

4          THE CLERK:  Friday the 12th.

5          THE COURT:  January 12 at 2:30.

6          THE CLERK:  At 2:30.

7          MR. TOBIN:  Your Honor, I may not be there.

8      If I may make inquiry, is that the Martin Luther

9  King weekend?

10          MR. DILDAY:  That is Martin Luther King.

11          MR. TOBIN:  I understand that that's the

12  Friday before that weekend.  I believe that I go on a
school

13  ski trip with my family that weekend to New Hampshire,
and I

14  typically take Friday off.  So any other day in January
is

15  fine other than that day.

16          THE COURT:  Thursday the 11th at 2:00.

17          MR. DILDAY:  Thank you, your Honor.

18          THE COURT:  Thursday the 11th at 2 p.m.

19      All right.  The defendant will be remanded to

20  custody awaiting sentencing, but we will proceed with the

21  sentence in early January as noticed by the Court.

22          MR. TOBIN:  Thank you, your Honor.

23          MR. DILDAY:  Thank you, your Honor.

24          THE CLERK:  All rise.

25              Court is in recess.



30


1              (Proceedings adjourned.)

2

3                    C E R T I F I C A T E

4

5

6

7              I, James P. Gibbons, Official Court Reporter for

8    the United States District Court for the District of

9    Massachusetts, do hereby certify that the foregoing pages

10   are a true and accurate transcription of my shorthand

notes

11   taken in the aforementioned matter to the best of my

skill

12   and ability.

13

14

15

16

17

                    JAMES P. GIBBONS, CSR, RPR, RMR
18                     Official Court Reporter
                     1 Courthouse Way, Suite 7205
19                   Boston, Massachusetts 02210
                          (617) 428-0402
20

21

22

23

24

25